UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.   )<br>)<br>(10) ADIANGEL PAREDES,   )<br>)<br>Defendant.   )<br>) | Criminal No. 19-cr-40049-TSHs |

# GOVERNMENT'S TRIAL BRIEF

The United States of America, by and through the United States Attorney for the District of Massachusetts, Rachael S. Rollins, and Assistant United States Attorneys Alathea E. Porter and Sarah B. Hoefle, respectfully submits this trial brief to identify relevant issues regarding the trial scheduled to begin on October 14, 2022 in connection with the above-captioned matter.

## I.   The Indictment

Adiangel PAREDES (hereinafter, "PAREDES" or the "Defendant") is charged in Count One of the Superseding Indictment with violating Title 21, United States Code, Section 846: Conspiracy to Distribute and to Possess with Intent to Distribute Heroin, Fentanyl, Cocaine, and Cocaine Base. *See* Docket 124. Count One further charges that 400 grams or more of a mixture or substance containing a detectable amount of fentanyl and 100 grams or more of a mixture or substance containing a detectable amount of heroin were reasonably foreseeable and attributable to PAREDES. *See id.*

## II.   Statement of Facts

### a.   *Investigation Initiation*

In September 2018, the FBI Boston Strike Force began an investigation into a drug trafficking organization ("DTO") operating in Fitchburg, Massachusetts led by Pedro and Anthony BAEZ

1

(respectively hereinafter, "PEDRO" and "ANTHONY").[1]

The investigation revealed that PEDRO was responsible for distributing a heroin and fentanyl mixture, cocaine, and crack cocaine to multiple customers throughout the Fitchburg, Massachusetts area. In the course of the investigation, agents learned that PEDRO led the DTO in coordination with his son, ANTHONY. ANTHONY either obtained narcotics directly from PEDRO or from suppliers they mutually used.

  b. *Title III Wiretap Orders*

Beginning in July 2019, United States District Judges for the District of Massachusetts issued orders pursuant to Title III authorizing the interception of wire and electronic communications to and from telephones used by members of the DTO and its suppliers, including two telephones used by ANTHONY (Target Telephones 1 and 2), two telephones used by PEDRO (Target Telephones 4 and 5), a telephone used by Pablo VIDARTE (hereinafter, "VIDARTE") (Target Telephone 3), a telephone used by PAREDES (Target Telephone 6), and a telephone used by Ricky FIGUEROA (hereinafter, "FIGUEROA") (Target Telephone 7).[2] *See* 19-91283-WGY.

Through investigative techniques, including the Title III interceptions, related physical surveillance, and controlled purchases, agents were able to identify multiple sources of drug supply utilized by the DTO. Agents identified VIDARTE as a heroin/fentanyl supplier of the DTO. Interceptions over VIDARTE's phone, in connection with surveillance and controlled purchases, led

---

[1] As this Court is aware, the investigation began following a fatal overdose on September 7, 2018. The government is not presently aware of direct evidence linking PAREDES to that overdose death, and therefore, the government does not intend to introduce any evidence at trial about the overdose death, or that the investigation began as a result of that death.

[2] Agents also received authorization to intercept three additional telephones as part of the investigation: two telephones used by Pedro VILLOT-SANTIAGO (Target Telephones 8 and 9), and one telephone used by Abel RODRIGUEZ-RIVERA (Target Telephone 10). Those interceptions are not relevant for the trial of PAREDES, and therefore, are not discussed herein, nor does the government intend to offer evidence from those interceptions in the trial of PAREDES.

agents to identify PAREDES as VIDARTE's source of heroin/fentanyl supply. Over the course of the investigation, agents identified FIGUEROA as the primary source of cocaine and crack cocaine to the DTO.

    c. *Controlled Purchases*

In addition to the Title III wiretap interceptions, during the investigation, agents utilized three cooperating witnesses (hereinafter, "CW-1," "CW-2," and "CW-3") to conduct controlled purchases of heroin/fentanyl and cocaine from the DTO. Between December 19, 2018 and March 27, 2019, CW-1 completed four controlled drug purchases from the DTO. For each of the controlled purchases, prior to controlled purchase, agents searched CW-1 for drugs and personal money, with negative results. Each of the deals was also audio and video recorded. All of the drugs purchased from the DTO were all submitted to the DEA Northeast Regional Laboratory for testing. The results confirm that for three of the controlled purchases the "heroin" CW-1 purchased from the DTO was actually a mixture containing both heroin and fentanyl, and for one of the controlled purchases the "heroin" CW-1 bought from the DTO was actually fentanyl. At the direction of agents, CW-1 told ANTHONY about a friend who was in the drug business and who liked ANTHONY's product and wanted to buy larger quantities from ANTHONY. In reality, that "friend" was actually another cooperating witness (hereinafter, "CW-2").

At the direction of agents, CW-2 contacted ANTHONY to arrange to purchase heroin. Between March and October 2019, CW-2 completed eight controlled drug purchases from ANTHONY and other members of the DTO. CW-2 coordinated the deals through recorded telephone calls with ANTHONY. For each of the controlled purchases, prior to meeting with ANTHONY, agents searched CW-2 for drugs and personal money, with negative results. Each of the deals was also audio and video recorded. All of the drugs purchased from the DTO were all submitted to the DEA Northeast Regional Laboratory for testing. The results confirm that all of the "heroin" CW-2

3

purchased from the DTO was actually a mixture containing both heroin and fentanyl.

*July 17, 2019 – Controlled Purchase of 150 Grams of Heroin/Fentanyl Mixture*

On July 17, 2019, at the direction of agents, CW-2 conducted a controlled purchase of 150 grams of "heroin" from ANTHONY.  ANTHONY and CW-2 agreed to meet in Watertown, Massachusetts to complete the deal.  Agents observed ANTHONY drive with co-defendant and co-conspirator Monica TROCHE (hereinafter, "TROCHE") to A&R Towing on Summer Street in Fitchburg, which agents identified as a garage where VIDARTE worked (hereinafter, the "Garage"). Agents observed ANTHONY and TROCHE, after being at the Garage for a short period of time, then drive to the Home Depot in Watertown to complete the controlled purchase with CW-2.  A little over an hour after the deal between CW-2 and ANTHONY was completed, agents observed ANTHONY arrive back at the Garage, go inside the building, and then leave approximately five minutes later. Laboratory results confirm the substance purchased by CW-2 to be 150.1 grams of a substance containing heroin and fentanyl.  Telephone records indicate that the Defendant was in contact with VIDARTE the day before and the day of this controlled purchase.

*August 21, 2019 – Controlled Purchase of 200 Grams of Heroin/Fentanyl Mixture*

In mid-August 2019, at the direction of agents, CW-2 made arrangements with ANTHONY for another controlled purchase of "heroin."  Following those calls, on August 14, 2019, agents intercepted a call over Target Telephone 2 between ANTHONY and VIDARTE, during which ANTHONY asked if VIDARTE could "get" him "something" for "the people in Boston." ANTHONY told VIDARTE he did not know how much he needed yet, but that it might be "a hundred and fifty, three hundred."  ANTHONY asked VIDARTE how quickly he could get that amount, and VIDARTE responded, "Like half hour."  Later that day, CW-2 and ANTHONY confirmed the deal for the following Monday (August 21, 2019).  Almost immediately after that call with CW-2, agents intercepted another call between ANTHONY and VIDARTE, during which ANTHONY told

4

VIDARTE that he needed "seventy five." VIDARTE confirmed, and ANTHONY told VIDARTE he would call him on Monday morning to remind him and let him know if the amount changed.

On the morning of August 21, 2019, agents intercepted a text message from ANTHONY to VIDARTE asking him to call him. Agents observed VIDARTE arrive at the Garage, then intercepted a call, during which ANTHONY told VIDARTE he would be there in two minutes. A few minutes later, agents observed ANTHONY and TROCHE arrive at the Garage. Agents observed ANTHONY carrying a medium sized white object, which appeared to be a bag with a towel over it. ANTHONY and TROCHE drove across the street from the Garage to a business plaza and appeared to meet with someone in a tan sedan for about fifteen minutes. ANTHONY and TROCHE then drove to meet CW-2 and completed the controlled purchase for 200 grams of heroin/fentanyl. As ANTHONY and TROCHE were driving back to Fitchburg, agents intercepted a call from ANTHONY to VIDARTE, during which ANTHONY told VIDARTE that he was five minutes away. Agents then intercepted a series of calls between ANTHONY and VIDARTE discussing where to meet. Agents observed ANTHONY and VIDARTE meet in the parking lot of the S&S Lobster restaurant. Laboratory results confirm the substance ANTHONY sold to CW-2 to be approximately 198 grams of a substance containing both fentanyl and heroin. Telephone records indicate that the Defendant was in contact with VIDARTE the day before and the day of this controlled purchase.

*September 24, 2019 – Controlled Purchase of 500 Grams of Heroin/Fentanyl Mixture and 500 Grams of Cocaine*

In mid-September 2019, at the direction of agents, CW-2 made a series of recorded calls to ANTHONY to arrange to purchase 500 grams of heroin and 500 grams of cocaine. CW-2 told ANTHONY that the cocaine was for CW-2's friend. In fact, CW-2's friend was another cooperating witness (hereinafter, "CW-3"). ANTHONY and CW-2 planned to conduct the deal on September 24, 2019, and made arrangements to meet at a hotel in Watertown, Massachusetts. Subsequent intercepted calls and surveillance indicate that ANTHONY obtained the heroin/fentanyl mixture from

5

ordered by CW-2 from VIDARTE, who obtained the drugs from PAREDES, and that ANTHONY and PEDRO obtained the 500 grams of cocaine from FIGUEROA.

On September 23, 2019, CW-2 made a recorded call to ANTHONY to confirm the deal. Approximately twenty minutes after that call, agents intercepted a call between ANTHONY and VIDARTE, during which ANTHONY told VIDARTE, "I need that, uh, thing that we talked about tomorrow morning." VIDARTE asked ANTHONY, "How much?" and ANTHONY responded, "200." They agreed that VIDARTE would have it around "9, 9:30."

Approximately fifteen minutes after the call with VIDARTE, agents intercepted a call between PEDRO and ANTHONY, during which ANTHONY asked PEDRO if he could get the 500 grams of cocaine for the deal with CW-2. PEDRO told ANTHONY that he needed to "text some people" to see "if they have it on deck." During this call, ANTHONY told PEDRO that "Pelau" was "getting it for [him] tonight too." Based on the investigation, "Pelau" was a moniker used by ANTHONY and PEDRO to refer to VIDARTE. Agents intercepted additional calls between PEDRO and ANTHONY during which they discussed PEDRO getting 500 grams of cocaine for ANTHONY.[3]

On September 24, 2019, at approximately 8:38 a.m., agents intercepted a call between ANTHONY and VIDARTE, during which ANTHONY asked VIDARTE to let him know when he was ready to meet. VIDARTE told ANTHONY to wait 10 or 15 minutes. Immediately after the call with ANTHONY ended, agents intercepted a call between VIDARTE and PAREDES. During the call, PAREDES agreed to meet VIDARTE at "the shop." About 20 minutes later, agents conducting surveillance observed a grey Honda Pilot park within the fenced in area of the Garage. The Honda Pilot was registered to PAREDES. Agents observed VIDARTE meet with a male driver, believed to

---

[3] Agents intercepted additional communications that indicate that PEDRO obtained the 500 grams of cocaine for the deal from FIGUEROA. The government intends to offer these communications as co-conspirator statements, which are relevant for context and to establish that FIGUEROA supplied the cocaine for this deal and that VIDARTE and PAREDES supplied the heroin/fentanyl mixture for the deal.

be PAREDES, and a female passenger in the Honda Pilot. About 10 minutes later, agents observed the Honda Pilot depart from the Garage.

At approximately 9:10 a.m., agents intercepted a call between VIDARTE and ANTHONY, during which VIDARTE told ANTHONY, "Your car is ready," which, based on the investigation, was code that the drugs were ready to be picked up. ANTHONY replied that he would be at the Garage soon. At approximately 10:02 a.m., agents conducting surveillance observed ANTHONY depart from PEDRO's residence and drive to the Garage where he met with VIDARTE. ANTHONY returned to his vehicle, removed an item from his shorts pocket, and placed the item in the trunk area of the van.

Prior to the meeting with ANTHONY, agents searched CW-2 and CW-3 for drugs and personal money, with negative results, provided CW-2 with $45,500 in official agency funds, and activated covert audio and video recording equipment inside the Watertown hotel room. Agents monitored a real-time audio and video transmission from outside the room during the entire operation. Agents observed ANTHONY and TROCHE arrive at the hotel, remove items from behind the backseat of their vehicle, and enter the hotel. Minutes later, ANTHONY and TROCHE went into the hotel room and completed the transaction for 500 grams of "heroin" and 500 grams of cocaine, in exchange for $45,500 from CW-2 and CW-3. Immediately after ANTHONY and TROCHE left the room, agents went into the room to retrieve the drugs and recording devices. Laboratory analysis confirmed the suspected heroin to be approximately 498.1 grams of a substance containing heroin and fentanyl.[4]

Agents conducted surveillance of ANTHONY and TROCHE as they departed the hotel. Agents observed ANTHONY and TROCHE travel to a Target store and go inside for a brief period

---

[4] Laboratory analysis confirmed the suspected cocaine to be 499.8 grams of cocaine. The cocaine was supplied by FIGUEROA, who has already pleaded guilty and been sentenced in this case.

of time. After they left the Target store, at the request of agents, Watertown Police officers conducted a traffic stop of ANTHONY and TROCHE before they left Watertown. During that stop, officers seized all but $281 of the $45,500 in official agency funds from ANTHONY. Officers issued TROCHE a warning for failing to signal a lane change, and then released TROCHE and ANTHONY from the scene. ANTHONY lied to the officer and stated that the money was for a car that he planned on purchasing.

Immediately after officers released ANTHONY and TROCHE from the traffic stop, agents intercepted a call between ANTHONY and PEDRO during which ANTHONY told PEDRO about being pulled over and the police taking the money. PEDRO told ANTHONY, "Just come and talk to me over here." About an hour and a half later, agents intercepted another call between ANTHONY and PEDRO, during which ANTHONY told PEDRO he was outside the house.

Later on the night of September 24, 2019, at approximately 6:40 p.m., agents intercepted a call between ANTHONY and VIDARTE during which ANTHONY asked VIDARTE to come see him in person. VIDARTE agreed to meet ANTHONY at ANTHONY's house in 20 minutes. About 40 minutes later, agents intercepted another call between ANTHONY and VIDARTE, during which VIDARTE said he was at the house. ANTHONY instructed VIDARTE to go upstairs to talk with his father (PEDRO).

At approximately 7:29 p.m., agents intercepted a call from VIDARTE to PEDRO. During the call, VIDARTE told PEDRO, "I wanted you to take care of things calmly" and he asked PEDRO if he had the money. PEDRO told him he did not, and that he lost money in the deal too. VIDARTE told PEDRO that he could not do anything, and that "those people are not going to understand. You are risking my life and my family's." At the end of the call, VIDARTE told PEDRO that he would wait to talk with the people he owed the money to until PEDRO and ANTHONY figured out a way to pay the money they owed VIDARTE.

8

The next day (September 25, 2019), agents intercepted a call between PEDRO and VIDARTE at approximately 9:04 a.m., during which VIDARTE questioned whether ANTHONY was lying about the police taking the money. PEDRO assured VIDARTE that ANTHONY was telling the truth, and told VIDARTE that he would help pay off ANTHONY's debt because he wanted to continue doing business with VIDARTE's suppliers. PEDRO told VIDARTE, "I want to help him pay that because I want him to continue with the people because if I don't get that shit, I can't make dough." PEDRO commented that he lost $18,000 of his own money when ANTHONY was stopped. Later in the conversation PEDRO told VIDARTE, "If he gives me a chance, in like 10 days, you know what I mean? If I can continue with the cocaine then I'll have dough to buy it." VIDARTE said he would "talk to him" and would see what happens. Over the next two hours agents intercepted additional calls between PEDRO and VIDARTE, during which PEDRO updated VIDARTE about collecting money to pay VIDARTE.

At approximately 10:52 a.m., agents intercepted a text message sent from VIDARTE to PAREDES. The message, translated from Spanish to English, stated, "Hello, bro, I think they lied to me, he said that he was stopped because of a stop, and they checked and they took the money." Minutes later, agents intercepted two more text messages from VIDARTE to PAREDES. The messages stated that VIDARTE was not happy and that VIDARTE wanted to meet to discuss what they were going to do. At approximately 10:53 a.m., agents intercepted a reply text message from PAREDES to VIDARTE. The message, translated from Spanish to English, stated, "Of course, have to do something." About a minute later, agents intercepted a call from PAREDES to VIDARTE, during which VIDARTE told PAREDES that he was suspicious that ANTHONY was actually stopped by the police. VIDARTE said the person responsible for losing the money was "Pedro's son, the old man that always buys from me, it's his son." PAREDES told VIDARTE, "No, you tell him, '*Listen, listen, get me…get me that money.*' You tell him, '*Hey, get me that dough. Those people are*

9

*asking.*'" VIDARTE replied, "I said to him, '*He knows where I live, he know where I work.*' I told him that I don't lie to people and that's why we get along just fine." PAREDES ended the conversation by telling VIDARTE that he would come to see VIDARTE.

At approximately 2:15 p.m., agents intercepted a call from VIDARTE to PEDRO. The conversation was conducted in Spanish and translated by Spanish linguist monitors. PEDRO told VIDARTE that he had $7,000 and was waiting for ANTHONY to bring him another $1,000. PEDRO told VIDARTE, "You know, we will give them eight and it's set. When we give them eight, it will be over and done with?" VIDARTE replied, "Yes, I see…it's the only way I was able to fix that for you and for me to not get into trouble."

At approximately 3:58 p.m., agents intercepted another call between VIDARTE and PEDRO, during which PEDRO told VIDARTE that he had the money and could bring it to VIDARTE the following day. VIDARTE replied that he would come to pick up the money from PEDRO when he got off work. During that call, PEDRO also asked VIDARTE if he could get him "at least 50." PEDRO told VIDARTE that he would "pay it in three days." VIDARTE responded, "Let me give him the dough so that he sees and, after that, I'll ask him for it." Agents intercepted calls later the same night indicating that VIDARTE went to PEDRO's house to collect the $8,000 to pay off ANTHONY's debt.

Approximately 30 minutes after intercepting a call indicating that VIDARTE arrived at PEDRO's house to collect money, agents intercepted a call from VIDARTE to PAREDES. During that call, VIDARTE told PAREDES that he went to PEDRO's house and "told him everything you told me to." VIDARTE told PAREDES that PEDRO gave him "five," and that PEDRO asked VIDARTE to help him out with "50" (50 grams of heroin/fentanyl) so he could "work" (sell drugs). PAREDES replied, "That's fine." PAREDES further stated that VIDARTE should no longer sell to ANTHONY, but should still supply PEDRO. PAREDES told VIDARTE, "I'm going to stop by

10

tomorrow early, and I'll give you that, you hear?"

About seven minutes after the call with PAREDES ended, agents intercepted a text message from VIDARTE to PEDRO. The message, roughly translated from Spanish to English, stated, "For tomorrow, he said you can count on him for anything," meaning PAREDES would continue to supply PEDRO through VIDARTE.

    d.  *Additional Title III Wiretap Evidence*

In addition to supplying ANTHONY and PEDRO with a heroin/fentanyl mixture in connection with the controlled purchases, based on interceptions over PEDRO, VIDARTE, and PAREDES's phones, VIDARTE and PAREDES supplied PEDRO with at least an additional approximately 550 grams of a heroin/fentanyl mixture. Between September and November 2019, agents routinely intercepted calls between PEDRO and VIDARTE, during which PEDRO ordered "50" (meaning 50 grams) from VIDARTE. Almost immediately after each of those calls, agents intercepted calls from VIDARTE to PAREDES ordering the same thing, and subsequently intercepted calls indicating that the deals were completed. Intercepted calls indicate that this occurred at least eleven times between September and November 2019.

Additionally, interceptions over PAREDES's telephone (Target Telephone 6) indicate that PAREDES also had multiple additional regular drug customers who he supplied with heroin/fentanyl, pills, and cocaine. One of PAREDES's regular drug customers was CW-5, who is expected to testify that PAREDES routinely sold him (CW-5) heroin and then fentanyl in quantities of 50-150 grams every other week in 2019. CW-5 is also expected to testify that he (CW-5) routinely sold cocaine to the Defendant, in quantities of 100-200 grams about every two weeks throughout 2019.[5]

---

[5] The government anticipates calling a cooperating defendant (CW-5) in its case-in-chief. The government expects that CW-5 will testify that he (CW-5) routinely sold cocaine to the Defendant, in quantities of 100-200 grams about every two weeks throughout 2019. The government also intends to introduce communications intercepted over Target Telephone 6 (a telephone used by the Defendant) between CW-5 and the Defendant regarding some of these cocaine transactions. Count One of the Superseding Indictment alleges that the conspiracy involved four different

**III.     Evidentiary Issues and Motions *In Limine***

  a.  *Law Enforcement Lay Opinion Testimony*

The government plans to call several law enforcement agents who will offer their lay opinion regarding certain aspects of the drug trade under Federal Rule of Evidence 701. Specifically, the government plans to offer testimony based on these agents' experience and training in narcotics investigations on the following topics: the *modus operandi* and structure of drug-trafficking organizations, the common roles within drug trafficking organizations, the common practice of drug traffickers of putting their phones in fictitious names, the common practice of fentanyl being mixed with heroin, the prices for different kinds of drugs, the methods of packaging drugs for distribution, the methods of adding cutting agents to drugs prior to distribution, the quantities of drugs consistent with distribution versus personal use, the methods by which drug traffickers collect drug proceeds, the prices for various drugs in Massachusetts during the relevant time period, and coded language used by drug traffickers in general and the Defendant and his co-conspirators specifically. The government plans to file a separate motion *in limine* on this topic.

  b.  *Co-Conspirator Statements*

Through the testimony of cooperating witnesses and law enforcement agents, as well as intercepted recordings and text messages, the government plans to offer statements made by the Defendant's co-conspirators in this case, specifically, PEDRO, ANTHONY, VIDARTE, Kent Ortiz, CW-5 (who is identified in Target Telephone 6 interceptions as "UM3201"), and others, as well as those whose identities remain unknown, but who were intercepted pursuant to Title III wiretap orders. The government intends to offer these statements under Federal Rule of Evidence 801(d)(2)(E) and

---

controlled substances: heroin, fentanyl, cocaine, and cocaine base. Though there is no allegation regarding a specific quantity of cocaine as to the Defendant, evidence of cocaine is directly relevant to the charged offense. In the alternative, evidence regarding the Defendant's involvement in cocaine trafficking would also be admissible as Rule 404(b) evidence for the permitted uses of showing motive, opportunity, intent, plan, knowledge, identity, absence of mistake, and accident.

*United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977). The government plans to file a separate motion *in limine* on this topic.

      c.  *Translations and Transcripts*

Some of the recordings and text messages the government intends to offer are in Spanish language. The government plans to offer translations of these exhibits as substantive evidence to be provided to the jurors during deliberations under *United States v. Rengifo*, 789 F2d. 975, 983 (1st Cir. 1986). The government plans to file a separate motion *in limine* on this topic.

For the recordings that are in English language, the government intends to offer transcriptions as chalks at trial. All of the English transcripts that the government intends to use, both the translated and original English, have been produced to defense counsel, or will be produced as soon as they are identified.

      d.  *Criminal History of Cooperating Defendants*

The government anticipates calling two separate cooperating defendants (referred to in productions as "CW-5" and "CW-6) in its case-in-chief. The government has already produced redacted copies of the criminal histories for both of the witnesses. Both of the cooperating defendants have convictions and arrests that are more than ten years old. Pursuant to Federal Rule of Evidence 609, the government requests that the Court preclude the Defendant from either eliciting testimony at trial, or referencing during opening statement or closing argument, any information regarding any arrests that did not result in a conviction, as well as any convictions that are older than ten years. The government plans to file a separate motion *in limine* on this topic.

      e.  *Preclusion of Evidence Regarding Potential Consequences of Conviction*

If convicted of the charged offense, the Defendant faces a ten-year mandatory minimum sentence, as well as potential immigration consequences. Pursuant to Federal Rule of Evidence 403, the government requests that the Court preclude the Defendant from either eliciting testimony during

the trial, or referencing during opening or closing argument, any information regarding the potential penalties the Defendant faces – including any mandatory minimum sentence pursuant to Title 21, United States Code, Section 841(b) and 846 or the United States Sentencing Guideline range – if convicted. The government plans to file a separate motion *in limine* on this topic.

### IV.     Expert Witness Testimony

Absent stipulations, the government intends to introduce evidence from three DEA chemists regarding their testing of the fentanyl and heroin mixtures purchased from ANTHONY on July 17, 2019, August 21, 2019, and September 24, 2019. The government has produced the drug certifications, testing, and analysis documents, and the chemists' CVs.

### V.      Stipulations of Fact

The government has attempted to confer with defense counsel regarding proposed stipulations, but has received no response. The government has proposed stipulations regarding chain of custody of drug evidence, the type and quantity of the drugs seized in this case, the accuracy of English translations of Spanish recordings, and the authenticity of communications intercepted pursuant to Title III wiretap orders. Should the parties reach any agreement on any of these stipulations prior to trial, the parties will file a signed copy of the agreed-to stipulations on the docket and/or introduce a copy of such signed stipulations as an exhibit at trial.

### VI.     Jury Instructions, Verdict Form, and Voir Dire

The government intends to file proposed jury instructions, a proposed verdict form, as well as proposed voir dire.

### VII.    Special Arrangements

a.      *Paralegal.*  The government respectfully requests that, in addition to trial counsel, the Court allow Justin Murphy, a paralegal from the United States Attorney's Office, to sit at counsel

table. Mr. Murphy is an integral member of the prosecution team and will assist the undersigned counsel in their efforts to introduce the evidence and exhibits in this case.

  b. *Case Agent*.  The government requests that the Court designate FBI Special Agent Bradley Gullicksrud as case agent.  The government anticipates that Agent Gullicksrud will be the first witness in its case-in-chief to testify and requests that after his testimony, he be allowed to sit at counsel table and/or in the courtroom as necessary to assist government counsel.

  c. *Length of Trial*.  The government expects its case-in-chief to last five trial days, excluding jury selection.

Dated: September 30, 2022

           Respectfully submitted,

           RACHAEL S. ROLLINS
           United States Attorney

        By: */s/ Alathea E. Porter*
           Alathea E. Porter
           Sarah Hoefle
           Assistant United States Attorneys

CERTIFICATE OF SERVICE

  I hereby certify that this document will be filed via ECF and thereby served on counsel of record.

           */s/ Alathea E. Porter*
           Alathea E. Porter
           Assistant U.S. Attorney

Dated: September 30, 2022