# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | **CRIMINAL ACTION** |
| v. | ) | **NO.  19-40049-10-TSH** |
| | ) | |
| **ADIANGEL PARADES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OF DECISION AND ORDER
## ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
### October 3, 2022

**HILLMAN, S.J.**

The United States of America (the "Government") charged Adiangel Parades ("Defendant") with conspiracy to distribute and possess with intent to distribute 280 grams or more of cocaine base and 500 grams or more of cocaine. The Defendant seeks to suppress evidence obtained from a wiretap authorized under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 ("Title III"). The Defendant assigns as reason for the suppression that the affidavit in support of the application for the wiretap failed to demonstrate that "normal investigative procedures had been tried and had failed, or reasonable appear to be unlikely to succeed if tried, or to be too dangerous," 18 U.S.C. § 2518(1)(c). For the following reasons, the motion to suppress is **denied**.

## Background

In the fall of 2018, the Federal Bureau of Investigation ("FBI") began an investigation into a drug trafficking organization ("DTO") following a fatal overdose. The autopsy report

indicated that the victim died from acute heroin and fentanyl intoxication.  Text messages found

on the victim's phone led agents to the individual who the victim contacted to purchase the drugs

just before his fatal overdose. That individual ("CW-1") agreed to cooperate and informed agents

that they had obtained the fatal drugs from Pedro Baez ("Pedro").

Through the investigation, agents learned that Pedro worked with his son Anthony Baez

("Anthony") to obtain and distribute a fentanyl/heroin mixture, cocaine, and cocaine base, to

multiple customers in the Fitchburg, Massachusetts area. Most of the DTO's customers were

drug users, but many also re-sold a portion or all of the drugs they obtained from Pedro and

Anthony.

Beginning in or about July 2019, United States District Judges in the District of

Massachusetts authorized interceptions of wire and electronic communications pursuant to Title

III to and from telephones used by members of the DTO.  On July 10, 2019, the Honorable

William G. Young, United States District Judge, signed an order ("July Order") authorizing the

initial interception of wire and electronic communications to and from a telephone used by

Anthony ("Target Telephone 1").  On or about August 8, 2019, the Honorable Nathaniel M.

Gorton, United States District Judge, signed an order ("August Order") authorizing the continued

interception of wire and electronic communications to and from Target Telephone 1, as well as

authorizing the initial interception of wire and electronic communications to and from another

telephone used by Anthony ("Target Telephone 2").  On or about September 16, 2019, Judge

Young signed the September Order authorizing the renewed interception of wire and electronic

communications to and from Target Telephone 2, authorizing the initial interception of wire and

electronic communications to and from Target Telephone 3, a telephone used by Pablo Vidarte

("Vidarte"), and authorizing the initial interception of wire and electronic communications to and

from a telephone used by Pedro ("Target Telephone 4"). On or about October 18, 2019, Judge Young signed the October Order, authorizing the initial interception of wire and electronic communications to and from another telephone used by Pedro ("Target Telephone 5"), authorizing the initial interception of wire and electronic communications to and from Target Telephone 6, used by Defendant Parades, and authorizing the initial interception of wire and electronic communications to and from a telephone ("Target Telephone 7") used by Ricky Figueroa ("Figueroa").

In issuing the October Order, Judge Young found probable cause that several individuals, including Defendant Parades, were engaged in the commission of criminal offenses enumerated in 18 U.S.C. § 2516, including drug distribution, use of a communication facility in the commission of drug trafficking offenses, conspiracy to traffic drugs, and money laundering ("Target Offenses"). Judge Young further found probable cause to believe that Target Telephone 6 was being used in furtherance of the Target Offenses, and that the interception of communications to and from Target Telephone 6 would reveal evidence regarding the Target Offenses, the identity of the persons involved, and the scope and nature of the illegal activity. Finally, Judge Young found that agents had established that normal investigative procedures had been tried and failed, appeared reasonably unlikely to succeed if tried, or were too dangerous to attempt.

The Government filed an affidavit by FBI Special Agent Bradley Gullicksrud in support of the October Order ("October Affidavit") and included the affidavit as an exhibit to its opposition. *See* Government's Opposition, Exhibit 1 (Docket No. 646), filed under seal. The October Affidavit sets forth the full history and details of the DTO, including background of Defendant Parades' role in the DTO. Over the course of the investigation, and before the

September Order was issued, agents identified Vidarte as the DTO's primary fentanyl/heroin supplier. Based on interceptions from Anthony, Pedro, and Vidarte's telephones, as well as controlled purchases and physical surveillance, agents identified Defendant Parades as Vidarte's fentanyl/heroin supplier. *See* Government's Opposition, Exhibit 2 ("September Affidavit") (Docket No. 646-1), filed under seal. Prior to the October Order, agents had already used a variety of techniques to investigate the DTO, including but not limited to physical and electronic surveillance, controlled purchases of fentanyl and cocaine, consensual recordings between cooperating witnesses and members of the DTO, as well as various search warrants, including package warrants, GPS tracking warrants on vehicles used by members of the DTO, and warrants for precise location information for various cellular telephones used by members of the DTO. Before the October Order was issued, agents successfully completed eleven controlled purchases of fentanyl and cocaine from the DTO.

On November 20, 2019, a federal grand jury sitting in Boston returned a six-count indictment charging Pedro and Anthony, along with six other individuals, with drug trafficking offenses.  The investigation into the DTO and those who supplied the DTO, including Vidarte and Defendant Parades, continued following that indictment. Between November 2019 and February 2020, agents received authorization to intercept three additional telephones used by other coconspirator suppliers to the DTO (Target Telephones 8, 9, and 10). On July 22, 2020, a federal grand jury sitting in Boston, returned an eight-count superseding indictment adding Defendant Parades, Vidarte, and eight other individuals to the original indictment.

## **Discussion**

Defendant argues that the Government did not establish necessity in the obtaining of the wiretap where less intrusive means were available and that issuance of the wiretap lacked

4

probable cause. The Government contends that the necessity requirement was well satisfied before seeking authorization to intercept the communications and there was ample evidence to support the issuance of the wiretap order.

*Wiretap*

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 25102520, promulgates the standards and procedures for the use of electronic surveillance. A judge may allow an application for interception of wire communications only when the following conditions are met:

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
>
> (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
>
> (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried to be too dangerous; and
>
> (d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral or electronic communications are to be intercepted are being used, or area about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3). Defendant contends that the Government failed to satisfy the third requirement, commonly referred to as the "necessity" requirement. 18 U.S.C. § 2518(3)(c).

*Necessity*

The "necessity" requirement demands that "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *United States v. Rodrigues*, 850 F.3d 1, 9 (1st Cir. 2017) (quotation marks and citations omitted). Accordingly, the wiretap applicant must

show that "the government has made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." *United States v. Martinez*, 452 F.3d 1, 4 (1st Cir. 2006) (quotation marks and citations omitted). The First Circuit has ruled however that "the government is not required to show that other investigative methods have been wholly unsuccessful, nor must the government exhaust all other investigative measures before resorting to wiretapping." *United States v. Cartagena*, 593 F.3d 104, 109 (1st Cir. 2010) (citations omitted).

In order to satisfy the necessity requirement, the Government is required to show that it "has used normal techniques but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence—to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable." *United States v. Abou-Saada*, 785 F.2d 1, 11 (1st Cir. 1986). "[B]are conclusory statements that normal techniques would be unproductive, based solely on an affiant's prior experience" are not enough to satisfy the necessity requirement. *United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989).

Defendant argues that the Government prematurely acquired a wiretap before it utilized normal investigative methods and asserts that the October Affidavit "offered only generic, conclusory explanations… and did not adequately explain law enforcements failure to pursue investigative techniques." *See* Motion to Suppress, at p. 5-6.[1] In connection with the October Order, the government submitted the October Affidavit, detailing the use, consideration and/or rejection of a number of traditional investigative procedures that the agents prior to seeking the

---

[1] Although Defendant does not appear to make any arguments specific to the September Order, Defendant was also intercepted over Target Telephone 3, a telephone used by co-defendant Pablo Vidarte. Interceptions over Target Telephone 3 were authorized pursuant to an order dated September 16, 2019 ("September Order"), and were supported by the September Affidavit. To the extent the Defendant seeks to suppress interceptions obtained over Target Telephone 3 pursuant to the September Order, his motion fails as to those interceptions as well.

wiretap. Those investigative methods included the use of cooperating sources and witnesses, the use of undercover agents, financial investigation, interviews of subjects and their associates, use of pen register, trap and trace devices, toll records, search warrants, examination of discarded trash, physical surveillance, and arrests of subjects. The October Affidavit explicitly explained how each of those investigative techniques had been used to limited success, were unlikely to succeed if used, or were too dangerous.  *See* October Affidavit, ¶¶ 88-128.

Defendant also fails to consider the broad goals of the investigation. While traditional investigative may have been sufficient to prosecute Defendant, they would not have been enough to successfully unearth and prosecute co-conspirators. For example, in *United States v. Rivera*, the defendant similarly argued that traditional investigative methods were yielding results and "there was no reason to believe that they were unlikely to succeed." 267 F. Supp. 3d 275, 276-77 (D.Mass 2017). The court concluded that the necessity requirement was met because, in addition to other factors, the affidavit stated, "the investigative objects that had not yet been met that justified a wiretap." *Id.* at 277; *see also United States v. David*, 940 F.2d 722, 729 (1st Cir. 1991) ("An application for electronic surveillance need not be based on proof positive that, without electronic assistance, a promising investigation is up a blind alley. It is enough that reasonable efforts to succeed without such assistance have been tried and failed."); *United States v. Delima*, 886 F.3d 64, 70 (1st Cir. 2018) ("We have upheld wiretap applications supported by affidavits that explain why the continued use of traditional investigative techniques (such as confidential sources, grand jury subpoenas, search warrants, surveillance and consensual monitoring) would be ineffective in uncovering the full scope of the potential crimes under investigation.") (internal citations omitted); *United States v. Santana*, 342 F.3d 60, 66 (1st Cir. 2003) (holding that the government's affidavit stating "that a wiretap was necessary to uncover the full scope of the

conspiracy, including conclusive proof of identity and information as to how the drug sales were made" contained the requisite details "regarding its inability to purse the criminal activity through less intrusive means"). The Court finds that the investigative efforts of the Government complied with the "necessity" requirement and that the Affidavit demonstrates that the Government made a "reasonable, good faith effort to run the gambit of normal investigative procedures before resorting to means so intrusive as electronic interception of phone calls." *U.S. v. Villarman-Oviedo* 325 F3rd, 1, 9, (1st Cir. 2003) *quoting U.S. v. Hoffman* 832 F2nd 1299, 1306-1307 (1st Cir. 1987).

*Probable Cause*

The First Circuit looks to the "totality of the circumstances." *United States v. Tiem Trinh*, 665 F.3d 1, 10 (1st Cir. 2011), *citing United States v. Barnard*, 299 F.3d 90, 93 (1st Cir. 2002). The Court should make a "practical, common-sense determination as to whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Indeed, probable cause is not based on absolute certainty of criminal conduct, but the "likelihood that an offense has been or is being committed." *Santana*, 342 F.2d at 65. The wiretap order should be upheld "if the facts set forth in the application were minimally adequate to support the determination that was made." *Villarman-Oviedo*, 325 F.3d at 9.

Defendant Parades' claims that the Government failed to establish that Target Telephone 6 was used by him and that there was no affirmative identification of Defendant Parades. The Government need only establish that there was probable cause to believe that (1) "an individual is committing, has committed, or is about to commit a criminal offense," and (2) that "communications concerning the offense" would be obtained through the interception of the

8

telephone at issue (Target Telephone 6). *Serrano*, 632 F. Supp. 2d at 105. When the Government filed the application for the September Order, agents had not yet identified the user of Target Telephone 6. *See id.*, ¶¶ 22(g) and 77.[2]  Thereafter agents identified Defendant Paredes as the user of Target Telephone 6.  *See* October Affidavit, ¶ 23(d).

The October Affidavit describes in detail the controlled purchase for 500 grams of fentanyl/heroin and 500 grams of cocaine between Anthony and two cooperating witnesses ("CW-2" and "CW-3"), which occurred on September 24, 2019. The October Affidavit describes the negotiations and planning leading up to that deal, including the interceptions and surveillance related to Vidarte obtaining the fentanyl/heroin from Defendant Paredes and subsequently providing it to Anthony. The October Affidavit further describes the deal between Anthony and the CWs, as well as the traffic stop that followed during which law enforcement seized the money from the controlled purchase. The October Affidavit recounts the interceptions and surveillance that followed the money seizure, which confirm that Defendant Paredes supplied Vidarte with the fentanyl/heroin that Vidarte subsequently supplied to Anthony.

Based on the information contained in the October Affidavit and those that were issued before it concerning the same DTO, there was ample probable cause to believe that multiple individuals had committed, were committed, and would continue to commit criminal offenses,

---

[2] In the September Affidavit, agents first identified Target Telephone 6 in or about September 2019 as they were preparing to seek authorization to intercept Target Telephones 2, 3, and 4. *See* September Affidavit at ¶ 22(g) and ¶ 57. At that time, agents had identified Vidarte as a fentanyl supplier to the DTO.  *See id.*, at ¶¶ 22(e) and 47-53. Based on intercepted calls between Anthony and Vidarte, as well as telephone analysis of Vidarte's telephone (Target Telephone 3), agents identified the user of Target Telephone 6 as Vidarte's drug supplier. *See id.*, at ¶ 22(g) and ¶ 77. Immediately after agents intercepted a call between Anthony and Vidarte, during which Anthony asked if Vidarte's "people" (suppliers) had the "white one" (cocaine). *Id.*, at ¶ 77. Call records show that Vidarte called Target Telephone 6. *See id.* The call between Vidarte and Target Telephone 6 lasted approximately one minute, and immediately after that call, Vidarte called Anthony back and told him that the price would be "40 each," meaning $40,000 per kilogram. *Id.* Vidarte had no other communications during the time period between the calls with Anthony and with Target Telephone 6. Id. Based on that information and the agent's training and experience, the agent stated his belief that the user of Target Telephone 6 told Vidarte the price of one kilogram of cocaine would be $40,000.

and also that interceptions to and from Target Telephone 6 would provide evidence of the Target Offenses.

**<u>Conclusion</u>**

For the reasons stated, Defendant's motion to suppress evidence is **<u>denied</u>**. (Docket No. 625).


**SO ORDERED.**


/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**SENIOR DISTRICT JUDGE**